IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| Tamika Smith, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1-23-cv00038-JRH-BKE |
| | ) | |
| Piedmont Augusta, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff who hereby shows the court the following:

1.      This action is brought under the ADA and Rehabilitation Act for disability discrimination and retaliation for protected and oppositional activity that caused a hostile work environment in November and early December 2021, a four-month leave without pay starting on December 15, 2021, a termination on about April 28, 2022, and a denial of transfer or rehire.

## JURISDICTION AND VENUE

2.       This court has federal jurisdiction under 28 U.S.C. § 1331, because one or more causes of action arises under federal law.

3.      Venue in this Court is proper under 28 USC § 1391, because the Defendant operates its business, at which Plaintiff was an employee, in the Southern District of Georgia, Augusta Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.      Plaintiff was informed she was terminated on about April 28, 2022, but before that Plaintiff submitted a verified Intake Questionnaire to the EEOC on about January 7, 2022, that listed race, color, disability (breathing) and retaliation.

1

5.      The EEOC received a Charge May 5, 2022, Charge No.14C-2022-00296, alleging disability and retaliation.

6.      A Notice of Right to Sue Letter was received by Plaintiff on or about October 28, 2022, and Plaintiff filed her complaint in the Magistrate Court of Augusta-Richmond County on January 17, 2023, which is less than 90 days after Plaintiff received the Notice.

PARTIES

7.      Plaintiff, Tamika Smith, is a U.S. citizen who worked as a Patient Safety Attendant for Defendant since about May 3, 2021.

8.      Plaintiff originally was hired by University Hospital in May of 2021; however, on March 1, 2022, University Hospital merged with Piedmont Healthcare, and is now doing business under the name Piedmont Augusta.

9.      Defendant Piedmont Augusta operates a hospital at 1350 Walton Way Augusta, GA 30901. Defendant has more than 15 employees, engages in interstate commerce, and receives federal funding, and therefore is subject to the ADA and Rehabilitation Act.

FACTS

10.     Plaintiff's position at Piedmont Augusta Hospital was that of a Patient Safety Attendant, and it was a "floater" position meaning she could be assigned to attend to a patient anywhere in the hospital.

11.     She began working as a Patient Safety Attendant in about May 2021, and she did the position successfully until the challenged leave without pay on December 15, 2021.

12.     The position of a Patient Safety Attendant ("PSA") ensures patient safety by remaining at the bedside of the assigned patient(s), while providing continuous observation under the direction of the registered nurse or physician.

2

13.     Plaintiff, as a PSA, watched and listened to equipment that monitors the patient's condition, watches restless patients and those who might try to take IV's out, get out of bed, and in general provides immediate response to signs of danger and corrects them herself, and if she cannot, she was to buzz/call the nurse.

14.     On some of the days Plaintiff worked in G-Pod, which at the time, was reserved for COVID-negative patients.

15.     As Defendant required her to perform basic PSA functions she would be close to the patient and breathing in the same air that the patient exhaled for a prolonged period of her twelve-hour days.

16.     Plaintiff and other PSA's were in a "floating pool" and could be assigned to care for a patient anywhere in the hospital.

17.     In the Fall of 2021, and early 2022, there were many patients who did have COVID, but there were entire wards of patients who did not have COVID.

18.     The Defendant had the capacity to and did identify and separate negative from COVID-positive patients.

19.     There was a substantial likelihood that there were patients who were negative as to COVID who needed a PSA, for one or more reasons.

20.     For the past three or four years Plaintiff has been treated for asthma that significantly impacts her breathing to such a degree that her physician has prescribed the use of an inhaler roughly two times a day, which enables her to live and work at a sustainable level.

21.     Since she has been prescribed her inhaler she has continued to use it as prescribed, twice a day.

22.     If Plaintiff does not use her prescribed inhaler, she eventually cannot breath sufficiently and would not be able to walk, or engage in strenuous activity, nor work.

23.     In about mid-October 2021, Defendant requested employees who thought they had a condition or conditions that could cause a health risk to the employee if the employee were to get or be exposed to COVID, to provide proof with a statement from a doctor about the sought after accommodation.

24.     HR provided a form to be completed by the doctor and returned.

25.     On 10/20/21, Plaintiff met with Curtis Wright, PA-C, and Matthew Clark, MD, of Covenant Family Allergy, to discuss her risks associated with COVID exposure.

26.     Plaintiff talked to Curtis Wright, PA-C, and Dr. Clark and informed them that she was a Patient Safety Attendant, and presumably they had some knowledge of what a PSA does.

27.     She told them that she was assigned to be close to patients to respond to their emergencies, and therefore she would be standing near the patient breathing the air exhaled by the patient to whom she was assigned.

28.     Plaintiff asked  Dr. Clark about the risk of being assigned to a COVID positive patient for someone with her breathing condition, which he had diagnosed as asthma, and whether she needed to avoid being assigned to be a PSA for COVID positive patients.

29.     Dr. Clark asked about her position, and with an understanding of the duties and responsibilities, as well as exposure risk, explained to her that because she could have to spend significant time in close proximity to a patient she would breathe the same air as the patient.

30.     Dr. Clark further explained that if a patient were infected with COVID, due to the fact she and the patient would be breathing the same air, she would be at an elevated risk of COVID infections.

31.     Dr. Clark and PA Wright explained that because of her pre-existing breathing condition, there was a substantial likelihood that if she caught COVID it could cause serious consequences.

32.     Additionally, Dr. Clark said that due to her history of "flare-ups" that Plaintiff's risks of complications were high.

33.     Dr. Clark stated that she should avoid working with COVID-positive patients.

34.     On 10/20/2021, Curtis Wright, PA-C, signed the form HR had provided called "University Hospital Augusta, Georgia Request for Exemption," stating, "[patient] cannot[,] due to her health conditions work with COVID-19 positive individuals."

35.     On Plaintiff's next working day, 10/22/21, she turned in the form to the Employee Health Department of Defendant that Dr. Clark's PA had completed, that indicated that Plaintiff's health condition should be accommodated, and that the employer should not assign Plaintiff to care for patients who had active COVID.

36.     From 10/22/21 through 12/9/21, Plaintiff's accommodation was honored and she was assigned to work with non-COVID patients including in the G-Pod, which was reserved for COVID-negative patients, except for about six times on about 11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, 12/12/21 as described below, ¶¶ 37-42.

37.     On each of these six dates (11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, 12/12/21) incidents occurred in which HR/Staffing had assigned Plaintiff to a COVID positive patient (or, as on 12/11-12/12, another infectious airborne disease), she complained about the assignment that was contrary to the doctor-based, needed accommodation, thereby opposing the failure to honor the doctor-ordered accommodation.

38.     HR and Staffing knew from the existence of the electronic medical record system, which patients had COVID and those who did not, or they could ask, because infectious disease protocol required that negative patients be isolated from COVID positive patients.

39.     With the possible exception of the first incident (11/11/21), when the assigned patient may have been misclassified as COVID negative, each of the incidents was intentional or done with willful and wanton disregard for Plaintiff's safety, and contrary to the sought-after, protected accommodation, because HR and Staffing who assigned her patients knew of her accommodation, and knew of the infectious status of the patient to which they assigned Plaintiff and did not inform Plaintiff of the infectious status of the patient before sending her to attend to the patient.

40.      For each of the incidents she was exposed to COVID (or the other airborne infectious disease on 12/11-12/12) causing her emotional distress and fear of infection.

41.     For at least three of the incidents (11/11, 11/15, 12/10) she was directed to go home early without pay or management used Plaintiff's vacation pay to pay her for time they had sent her home.

42.     For each of the incidents, when Plaintiff complained about and opposed the failure to honor the accommodation, she was met with disdain and hostility from her co-workers and supervisors.

43.      On December 3rd, 2021, Plaintiff's boss, Jessica Fatta, had a meeting with Plaintiff, and spoke to Plaintiff in an intimidating and sarcastic tone and Supervisor Fatta conveyed the following:

a.  that she had been informed from Staffing or HR that Plaintiff had complained about
    being assigned to COVID positive patients on the preceding days (11/11/21, 11/15/21,
    11/21/21), and Plaintiff explained what happened on those days;

b.  Supervisor Fatta requested that Plaintiff withdraw her accommodation paperwork;

c.  Supervisor Fatta also stated that if Plaintiff did not withdraw her accommodation request
    that "there would be consequences," implying there would be adverse job consequences,
    or adverse treatment;

d.  Supervisor Fatta said that everyone else had withdrawn their accommodations;

e.  Even though Supervisor Fatta had threatened adverse job consequences, Plaintiff refused
    to withdraw her accommodations.

44.  As to the 12/10/21 failure to honor Plaintiff's accommodation when Plaintiff was directed
to go home early without pay (by using her vacation pay), Plaintiff went to her boss, Jessica
Fatta, and complained to her about what had happened, but supervisor Fatta refused to stop
Plaintiff from being sent home.

45.  On December 13th and 14th Plaintiff called in sick, and had a Doctor's excuse.

46.  On December 13th she went to the Doctor and told the Doctor about a group of bumps on
her skin, and they checked her pulse, and the Doctor told Plaintiff she was suffering from stress.

47.  The Doctor advised Plaintiff to stay out another day.

48.  December 15th was a day off.

49.  On December 15, 2021, Plaintiff received a call from her boss, Jessica Fatta, HR Jamelle
Wells, and Employee Health Nurse, Kim Saggus, who designated Plaintiff on leave without pay
as of December 15, 2021, stating that Plaintiff could not come back to work, and that Plaintiff's
Doctor needed to fill out the accommodation paperwork differently; without specifying how, and

thereby implying that Plaintiff's Doctor needed to withdraw her accommodation request, and, alternatively, told her that they were not going to accommodate anyone who could not safely be around patients with COVID.

50.    They tried to get Plaintiff to sign a form to volunteer for leave of absence but she refused.

51.    Plaintiff told them that she needed to work, and that she did not need a leave of absence, especially a leave without pay.

52.    Plaintiff told them about her asthma or breathing condition that required the accommodation from working with COVID positive patients.

53.    Plaintiff said that she would work in another department.

54.    Plaintiff told them that she had a Bachelor's degree, could type well, use Word, Excel, Power point, Adobe, and several of its functions, and that she had learned Epic, which was the hospital's program for charting medical information and finding information about scheduling, so she could be a Scheduler setting appointments.

55.    They told Plaintiff that they would not transfer her to a different position and that she would have to apply, and Plaintiff's job applications are detailed below, ¶¶ 63-68.

56.    On December 16th Plaintiff followed up with an email to Jamelle Wells about getting a Doctor's appointment on January 14, 20222, with Dr. Clark in order to get another statement.

57.    Plaintiff had an appointment scheduled before January 14, 2022, with her family doctor at Aiken Family Med Center, so Plaintiff took the form completed October 20, 2021, by Dr. Clark to Dr. Tam, who said he did not see anything wrong with the prior statement by Dr. Clark.

58.    At the appointment on January 14th at Dr. Clarke's practice and with Curtis Wright, who is a PA, to Plaintiff's knowledge, they wrote the following: "Pt had follow up 1/14/2022. Pt. Ms.

Smith cannot work with COVID-19 positive patients with NO accommodations.  There are no exceptions because if Pt develops COVID-19 she may experience a negative outcome."

59.     On the 14th or 15th of January, Plaintiff gave the doctor's statement in person to Jane, in the HR department, because Jamelle Wells was not there that day.

60.     On January 17th Plaintiff emailed Jamelle Wells, asking for the next step, because there had been no contact.

61.     Jamelle, said she would check Employee Health, and let Plaintiff know.

62.     Plaintiff was never allowed to return to work.

Applications to Other Positions with Defendant

63.     During the period from late December to the termination in April 28, 2022, Plaintiff applied to numerous administrative positions that did not involve direct patient care, including: a Cash Posting Specialist, Scheduler/Prior Authorization, Service and Support Representative, Scheduler at Augusta Heart Summerville Campus, Registration Specialist in the Breast Health Imaging Center, Access Coordinator Breast Health Imaging Center, and Scheduler in Neurology.

64.     Each of the positions to which Plaintiff applied had an opening as indicated by the posting on the Defendant's job website.

65.     Upon information and belief Plaintiff was qualified for each position based on her review of the job description as compared to her qualifications, training, education, and experience.

66.     From January through April, 2022, Plaintiff was in regular contact with HR's Jamelle Wells, calling or emailing her twice a week about her applications, and noting the positions she had applied for, and Jamelle Wells told Plaintiff that Plaintiff would receive a call about them if they were interested.

67.     Plaintiff never received any response to her job applications, in spite of good qualifications for open administrative positions that appeared entry-level with moderate, position- specific training required, like those for which she had applied.

68.     Plaintiff learned from HR's Jamelle Wells that Ms. Wells had informed the departments or decision makers for the positions to which Plaintiff had applied, that Plaintiff had an accommodation that prevented her from working around COVID positive patients.

Termination

69.     On April 27th, 2022, Jamelle Wells and Jessica Fatta sent an email saying they had called and wanted to talk about Plaintiff's job.

70.     Plaintiff sent an email back, saying she had tried multiple times to resolve the issue about getting other work, and that they should communicate with her by email because their calls resolved nothing, and were giving Plaintiff migraines.

71.     The content of the email had challenged Defendant's failed resolution of the accommodation and lay off issue, and two or three days later Plaintiff received a letter, signed by Jamelle Wells, terminating her.

72.     The letter said that Plaintiff was being terminated for failure to follow policies without detailing any specifics, but Plaintiff had followed all policies, and verbal directions, save for the unlawful command to withdraw her accommodation.

73.     The rejection made Plaintiff feel unwanted by everyone, even in her department.

**COUNT I**
**Rehab. Act and ADA Discrimination on the Basis of an Actual Disability**

74.     As detailed in this Count, on account of Plaintiff's disability she was subjected to (1) failure to accommodate, (2) a hostile work environment, (3) leave without pay, (4) termination, and (5) failure to transfer or hire into a different position.

10

Qualified Individual

75.    Plaintiff was qualified for the job of Patient Safety Attendant, as she had performed it since May 2021, until December 15, 2021, when she was placed on leave without pay.

76.    The job of Patient Safety Attendant, required her to work with patients with intense, or special needs, sit near them, and react to their needs, by solving the problem herself, or by calling a nurse or others for help.

77.    From the fall of 2021 through at least April 2022 the Hospital identified and isolated COVID-negative patients and Plaintiff could have been assigned to patients who needed a PSA but were free from COVID.

78.    At no point was working with COVID patients an essential job function because Plaintiff Plaintiff's position was among the PSA's whole were "floaters" who were assigned and could be assigned to anywhere in the hospital.

79.    Upon information and belief Plaintiff was qualified for each of the positions to which she applied based on her review of the job description as compared to her qualifications, training, education, and experience.

Disability

80.    During the material time, 2021 through the present, Plaintiff suffers from asthma that substantially limits a major life function (breathing), and that for the past three or four years she had a doctor's order to use a prescribed inhaler two times a day to prevent flare ups and shortness of breath that would interfere with or eventually prevent her from working.

81.    Before diagnosis and treatment, when she walked a long distance or did physically demanding work she would be out of breath.

11

82.    Without an inhaler she would be unable to perform any tasks requiring substantial movement or physical labor.

Failure to Accommodate

83.    On 10/20/2021 Plaintiff requested an accommodation, not to be assigned to COVID positive patients, due to her asthma, to prevent or minimize the risk of her contracting COVID and suffering major adverse health consequences as a result of her breathing disability.

84.    Defendant failed to accommodate Plaintiff on 11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, and 12/12/21, when Plaintiff was assigned to a COVID-positive patient or patient with other infectious airborne disease.

85.    Defendant failed to accommodate Plaintiff on 12/15/21 when she was placed on leave without pay against her will.

86.    At all material times the requested accommodation was reasonable because:

a. The hospital identified and isolated COVID-negative patients including in G-pod, and upon information and belief many of those patients needed a Patient Safety Attendant and those patients were available as work assignments for Plaintiff, who was a floater, who could be assigned anywhere in the hospital.

b. Other protective measures such as masking and the vaccine were inadequate to prevent a substantial risk of serious injury to Plaintiff.

87.    Plaintiff also requested an accommodation when she requested a transfer and applied to non-patient jobs on 12/15/2021 through the Spring of 2022.

88.    The transfer request and job applications were reasonable accommodations because Plaintiff was qualified for them and there were openings, *see* ¶¶64-65, and the positions would

12

eliminate or greatly reduce any risk of getting a case of COVID made more severe by her disability.

Hostile Work Environment

89.     From 11/11/21 through 12/15/21 Plaintiff suffered a hostile work environment on the basis of her disability.

90.     The hostile work environment was sufficiently severe because Plaintiff was exposed to COVID or other infectious airborne diseases six times (11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, 12/12/21), because three of those times her hours were cut short and she was sent home early without pay (when management used her vacation time instead), because she was subjected to hostile and demeaning mis-treatment by her co-workers and supervisors, because her boss Jessica Fatta on 12/3/21 threatened her with adverse consequences, and as a result Plaintiff suffered emotional distress, fear of infection, and stress resulting in physical symptoms as diagnosed by her Doctor who found her medical condition sufficiently severe to prevent her from working, *see* ¶¶45-47.

91.     The hostile work environment was caused by Plaintiff's disability, because her coworkers and supervisors were upset by her accommodation needs and her refusal to withdraw her medically necessary accommodation.

92.     Defendant is liable because Plaintiff's boss Jessica Fatta, who had the authority to terminate her and change the terms and conditions of her employment, was made aware of the hostile treatment at least by late November 2021, and she nonetheless allowed it to continue and participated in it by threatening Plaintiff with adverse consequences for not withdrawing her accommodation on 12/3/21, and by refusing to prevent Plaintiff from being sent home early on 12/10/21.

Defendant Assigned Plaintiff to Leave Without Pay Involuntarily

93.     The leave without pay from 12/15/2021 through April 2022 was on the basis of Plaintiff's disability: Defendant, through Plaintiff's boss Jessica Fatta, HR Jamelle Wells, and Employee Health Nurse, Kim Saggus, imposed the leave because Plaintiff would not withdraw the accommodation that she required because of her asthma.

Termination

94.     Plaintiff's termination on about 4/28/2022 was caused by her disability: Defendant, through Plaintiff's boss Jessica Fatta, and HR Jamelle Wells, terminated Plaintiff because they did not want to accommodate her disability.

95.     Defendant's stated reason for the termination, failure to follow policies, was discriminatory or pretextual, because upon information and belief, because upon information and belief it was to cover for terminating Plaintiff for her  refusal to withdraw her accommodation.

Denial of Transfer or Rehire

96.     Defendant, through HR Jamelle Wells, interfered with and caused the denial of Plaintiff's request to transfer and application to other positions, *see* ¶63-68, because of Plaintiff's accommodation for her asthma.

**COUNT II**
**Failure to Engage in the Interactive Communication Process**[1]

97.     From 12/15/21 through the Spring of 2022, Defendant failed to reasonably and in good faith engage in an interactive communication process to determine (1) if Plaintiff could continue

---

[1]     Plaintiff acknowledges that the Eleventh Circuit does not currently recognize this as an independent claim for relief separate from a failure-to-accommodate claim, but Plaintiff seeks to preserve for appeal the argument that it should be recognized as such.

being a Patient Safety Attendant to non-COVID patients and (2) if Plaintiff could transfer or be rehired in a position that did not involve patient care.

98.      As to (1) Defendant insisted that Plaintiff withdraw her accommodation, and upon information and belief, knew that there were Patient Safety Attendant work assignments available that involved COVID-negative patients or turned a blind eye and failed to investigate.

99.      As to (2) upon information and belief Plaintiff was never meaningfully considered for the positions to which she applied because HR Jamelle Wells informed those departments or decision makers that Plaintiff had received an accommodation to prevent her from being around patients with COVID.

### COUNT III
### Rehab. Act and ADA Regarded-as Discrimination

100.     Plaintiff brings claims of discrimination for regarding her as having a breathing impairment and taking adverse actions on that basis of: (1) a hostile work environment,  (2) leave without pay, (3) termination, and (4) failure to transfer or hire in a different position.

101.     Plaintiff was qualified to continue working as a Patient Safety Attendant and was qualified for the positions to which she applied for the same reasons detailed above, *see* ¶¶75-79.

102.     Plaintiff was regarded as a having an impairment during the material time because:

a. she requested and received an accommodation on 10/22/21 for her breathing condition;

b. she objected to the failure to honor that accommodation when she was assigned to a COVID-postive patient or patient with other infectious airborne disease on 11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, 12/12/21;

c. she refused her boss Jessica Fatta's request for her to withdraw her accommodation on 12/3/21;

c. on 12/15/2021 Plaintiff told her boss, Jessica Fatta, HR Jamelle Wells, and Employee Health Nurse, Kim Saggus, that she had asthma or a breathing condition requiring her to have an accommodation from working with COVID positive patients;

d. on 1/14 or 1/15 2022 Plaintiff gave HR another doctor's note confirming her need for an accommodation from working with COVID patients;

e. and, upon information and belief, HR Jamelle Wells told the departments or decisionmakers to which Plaintiff had submitted job applications that Plaintiff had an accommodation from working with COVID patients.

Hostile Work Environment

103.    From 11/11/21 through 12/15/21 Plaintiff suffered a hostile work environment on the basis of her regarded-as disability, namely asthma or a breathing impairment.

104.    The hostile work environment was sufficiently severe as detailed above, *see* ¶90.

105.    Defendant is liable because Plaintiff's boss Jessica Fatta, who had the authority to terminate her and change the terms and conditions of her employment, was made aware of the hostile treatment at least by late November 2021, and she nonetheless allowed it to continue and participated in it by threatening Plaintiff with adverse consequences for not withdrawing her accommodation on 12/3/21, and by refusing to prevent Plaintiff from being sent home early on 12/10/21.

106.    The hostile work environment was caused by Plaintiff's regarded-as disability, because Plaintiff's coworkers and her boss Jessica Fatta were upset by her accommodation and refusal to withdraw her accommodation.

### Defendant Assigned Plaintiff to Leave Without Pay Involuntarily

107.    The leave without pay from 12/15/2021 through April 2022 was on the basis of Plaintiff's disability: Defendant, through Plaintiff's boss Jessica Fatta, HR Jamelle Wells, and Employee Health Nurse, Kim Saggus, imposed the leave because Plaintiff would not withdraw the accommodation that she required because of her asthma or breathing impairment.

### Termination

108.    Plaintiff's termination on about 4/28/2022 was caused by her disability: Defendant, through Plaintiff's boss Jessica Fatta, and HR Jamelle Wells, terminated Plaintiff because they did not want to accommodate her asthma or breathing impairment.

109.    Defendant's stated reason for the termination, failure to follow policies, was discriminatory or pretextual, because upon information and belief it was to cover for terminating Plaintiff for her  refusal to withdraw her accommodation.

### Denial of Transfer or Rehire

110.    Defendant through HR Jamelle Wells, interfered with and caused the denial of Plaintiff's request to transfer and applications to other positions, *see* ¶63-68, because of Plaintiff's accommodation for her asthma.

### COUNT IV
### Rehab. Act and ADA Retaliation

111.    Defendant retaliated against Plaintiff, on the basis of her protected complaints and opposition, by taking the following adverse actions: (1) a hostile work environment,  (2) leave without pay, (3) termination, and (4) failure to transfer or hire in a different position..

### Protected Activity

112.    Plaintiff had a good faith and objectively reasonable belief that her asthma rose to the level of a disability and that she had a right to request and receive an accommodation.

113.   Plaintiff engaged in protected requests for accommodations: on 10/22/21 and 1/14/22 when she submitted the forms completed by her doctor stating that she needed an accommodation from being assigned to be a PSA for and working closely with COVID positive patients.

114.   Plaintiff engaged in protected requests for accommodations on 12/15/21 when she requested to be able to continue working as a Patient Safety Attendant or to be transferred to a position that did not involve working with COVID positive patients.

115.    Plaintiff engaged in protected requests for accommodations from late December 2021 through the spring of 2022 when she applied for other jobs with Defendant, *see* ¶63.

116.   Plaintiff engaged in protected opposition, to what she reasonably believed was unlawful disability discrimination and retaliation, when she objected to the failures to honor her accommodation, by assigning her to work with patients who had COVID or other infectious airborne diseases on 11/11/21, 11/15/21, 11/21/21, 12/10/21, 12/11/21, and 12/12/21.

117.   On 12/3/2021, Plaintiff engaged in protected opposition when she refused to comply with her boss Jessica Fatta's request that Plaintiff withdraw her accommodation request.

118.   On 12/10/2021, Plaintiff complained to her boss Jessica Fatta that her accommodation had not been honored and that she had been sent home early.

119.   On 12/15/2021 Plaintiff objected to being put on leave without pay because she needed an accommodation for her breathing condition.

Hostile Work Environment

120.   From 11/11/21 through 12/15/21 Plaintiff suffered a hostile work environment on the basis of her protected activity.

121.   The hostile work environment was sufficiently severe as detailed above, *see* ¶90.

122.     Defendant is liable because Plaintiff's boss Jessica Fatta, who had the authority to terminate her and change the terms and conditions of her employment, was made aware of the hostile treatment at least by late November 2021, and she nonetheless allowed it to continue and participated in it by threatening Plaintiff with adverse consequences for not withdrawing her accommodation on 12/3/21, and by refusing to prevent Plaintiff from being sent home early on 12/10/21.

123.     The hostile work environment was caused by Plaintiff's protected activity, because Plaintiff's coworkers and her boss Jessica Fatta were upset by her accommodation and refusal to withdraw her accommodation.

Defendant Assigned Plaintiff to Leave Without Pay Involuntarily

124.     The leave without pay from 12/15/2021 through April 2022 was on the basis of Plaintiff's protected activity: Defendant, through Plaintiff's boss Jessica Fatta, HR Jamelle Wells, and Employee Health Nurse, Kim Saggus, imposed the leave because Plaintiff would not withdraw her accommodation and because Plaintiff had complained about her accommodation not being honored.

Termination

125.     Plaintiff's termination on about 4/28/22 was caused by her protected activity: Defendant, through Plaintiff's boss Jessica Fatta, and HR Jamelle Wells, terminated Plaintiff because of her protected activity including her accommodation request and refusal to withdraw it.

126.     Defendant's stated reason for the termination, failure to follow policies, was retaliatory or pretextual, because upon information and belief it was to cover for terminating Plaintiff for her refusal to withdraw her accommodation.

Denial of Transfer or Rehire

127.    Defendant through HR Jamelle Wells, interfered with and caused the denial of Plaintiff's request to transfer and applications to other positions, *see* ¶63-68, because of Plaintiff's accommodation requests and refusal to withdraw her accommodation request.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully prays for relief as follows:

A. For a trial by jury;

B. For a finding that Defendants violated Plaintiff's rights as set forth herein;

C. For a judgment in Plaintiff's favor for reinstatement; with full back pay plus interest; reinstatement of full fringe benefits and seniority rights; compensatory damages for emotional distress; compensatory damages for loss of reputation, wages, and benefits; punitive damages against the individually named defendants; attorney fees; and litigation costs or, in the alternative;

D. Plaintiff is therefore entitled to full front and back pay; compensatory damages for emotional distress; compensatory damages for loss of reputation, wages, and benefits; punitive damages; attorney fees, and litigation costs; and,

E. Any such other and further relief as the Court deems proper and just.

## **JURY DEMAND**

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted, this 2nd day of June, 2023.

*/s/John P. Batson*
John P. Batson
Ga. Bar No.  042150
1104 Milledge Road
Augusta, GA 303904

*Counsel for Plaintiff*
Tel: (706) 737-4040
jpbatson@aol.com
